Martha Romero, who is the surviving widow of Ruben Garcia Villalpando. She comes in the capacity of herself and is a representative of three children and the two parents of Mr. Villalpando, who was the victim of an officer-involved shooting on February 20, 2015. We are here on the court's grant of summary judgment, granting qualified immunity to Officer Clark for the shooting of Mr. Villalpando, and we appeal that determination as a matter of law that he was entitled to qualified immunity. The first point that we do raise on our brief is the trial court disregarded a material issue of fact that is actually raised by Officer Clark's own testimony in the record regarding the distance between him and Mr. Villalpando at the time he shot Mr. Villalpando on the roadside. Officer Clark gave a statement immediately after the shooting to an investigator that the distance was about six feet. In his deposition, which is in the record, and the video excerpt is in the record as well, he testified that Mr. Villalpando was at arm's length and could actually reach out and touch his weapon. In Officer Clark's declaration he filed in support of the motion for summary judgment, he stated that it was, quote, a few feet or I don't know. So we believe that that raises a material issue of fact. It could certainly affect the outcome of the case in determining whether or not Officer Clark acted reasonably in using deadly force in this instance. Let me ask you just how much of a factual difference that is. I'm not real good with guessing distances, but if the officer has his weapon outstretched, if the other person outstretches his arm, one of that distance is about four feet, two feet for each arm. He said maybe six feet, maybe he said a few feet. I will say the difference between those three characterizations is pretty small. Well, the difference is maybe more particularly directed toward Officer Clark's testimony in his deposition that the victim could actually reach out and grasp his weapon versus him being at a distance of six feet, and I would suggest to the court that is material and that is a difference in his testimony, and it was certainly ignored by the trial court. There's no evidence in the record, or there's nothing in the court's opinion that the court dealt with and or concluded that that was not a material fact on summary judgment. What was the question phrased, how far was he from my gun, from the officer's gun or from the officer? Because then you get six feet, that's a few feet as opposed to arm's length. Well, I would suggest to the court that the differences are material because Officer Clark, while he is extending his gun, he is intending to use deadly force, and whether the suspect is in a position to actually reach out and grab his gun is material, and at six feet, I would suggest to the court that he would not be able to reach out and grasp the gun. I think that's what Judge Southwick is asking. Is the six feet from the approaching Mr. Velopondo and the gun that's extended, or is it from the policeman who's already told him, keep your arms up? He told him like 30 times, keep your hands up, stay in the car, stop. So I don't exactly know what kind of a difference you're relying on. Well, the statement that he gave to the investigator in the criminal investigation, it's Officer Clark's own words, and I believe he said that he was physically six feet away from Mr. Velopondo at the time that he shot. He physically, his body? His body. His hand with the gun in it. I believe that his statement implies that he was six feet away physically, his body, from Mr. Velopondo's body. The second issue that I think dictates reversal is there is no evidence in the record that Mr. Velopondo committed what this court calls a manus act, in other words, the act which would precipitate the use of deadly force. And Officer Clark, who is the only surviving witness demonstrated in his deposition on the video, which is in the record, that Mr. Velopondo had one hand near his head and one hand on top of his head at the moment that he fired the shot. Now, there's nothing in the record that Officer Clark brought to the trial court that indicated that Mr. Velopondo's hands were moving at the time that he fired the shot. Now, every case cited by Officer Clark in the trial court and in this court involves a suspect where their hands are moving, the suspect is lunging towards the officer, the suspect is running towards the officer, the suspect is moving his hands in such a way that it would indicate that he could be reaching for a weapon. As the court knows, the presence of a weapon is really irrelevant because there are many cases where unarmed suspects have been shot by law enforcement officers and the court has found that to be reasonable under the circumstances because the hands were being moved in such a way that it indicated to the officer that there was a reasonable belief that the suspect could be reaching for a weapon. Wasn't there testimony that he had reached towards his back or into the car, that there was this constant hands up request or demand? Well, Your Honor, it's on the video. Did they show him reaching behind his back? The video shows for a full three minutes before the shooting that Mr. Velopondo's hands are either extended, outstretched, they're either on his head, or there is a period of time where he put them behind his back, but the hands were always visible to the officer. Well, not when they're behind his back. Well, if you look at the video, Mr. Velopondo had turned his back to the police officer, and it's only at that moment that he put his hands behind his back. At all times, his hands were visible to the officer. The argument that's made by the other side is that in addition to earlier concerns about whether he was seeking a weapon inside the vehicle or whatever, the concern at the stage of the shooting was either a lunge towards Officer Clark to grab his weapon or to push him into the line of traffic, which was quite close. I haven't had a case quite like that, but that does raise the same kind of concern about life-threatening actions by the person who ends up getting shot. Why don't you work with that with me? Sure. And that really ties into the two cases relied upon by the trial court. One was an Eighth Circuit case and one was a Tenth Circuit case. Both of those cases involved officers that were being approached by suspects, which may or may not have been armed. And in both of those cases, the Blossom case and the DeLuna case, the suspect lunged toward the officer. And Officer Clark was very clear in his testimony that Mr. Villapando was moving towards him at the same pace that is shown on the video, and there are only two seconds that are not shown on the video. So the evidence is clear that there is no lunging involved toward Officer Clark in the record. But the issue, Judge Southwick, about the traffic is an issue which, on our brief, we argue that the trial court impermissibly weighed that evidence in favor of Officer Clark on summary judgment. If you view the video, and we reference that in the video, there is no oncoming traffic at the moment of the shooting. Wouldn't the traffic be coming from behind Officer Clark? That's true. He could be trying to listen to it, I guess, but he would not have as much awareness of what's right behind him, it would seem to me, on traffic. Right. So he shot him at a time when it could well have been a car right behind him, as far as he knew. But he didn't, and he admitted on his deposition that he did not know whether or not there was a car approaching at the moment that he made the decision to shoot. In other words, the issue of traffic was not a situation where Officer Clark said, I've got a car coming up, I feel a car coming up, and I'm going to shoot this man in case he tries to push me into a particular vehicle that he sensed was approaching. He said he didn't know. So that's why we believe that the trial court impermissibly weighed that evidence, or lack thereof, in favor of Officer Clark. There's another thing I would like to point to the Court's attention is, and Officer Clark testified about it, is that he was not aware of any occurrence ever in the history of law enforcement where an officer had been pushed into traffic. And I would commit to the Court that that is part of the reasonableness analysis. In other words, can a reasonable officer believe that something is getting ready to happen that has never happened in the history of their knowledge, that they have no knowledge of that ever happening in law enforcement? And what also goes into that reasonableness analysis are the relative sizes of the individuals. And that factor is weighed in many cases, and especially in one of the cases cited by the trial court, the Blossom case, where there was a mismatch between the officer and the suspect. These two men were similarly situated in their size. That also goes into the reasonableness analysis where Officer Clark had other nonlethal means on his person to use to subdue and or detain, arrest Mr. Villapando. All of that goes into the reasonableness analysis. The Court knows that the failure to follow police procedure is not necessarily indicative of a lack of reasonableness, but it goes into the analysis. And there's no question that Officer Clark did not give any verbal warning of his intent to use deadly force prior to using deadly force in violation of the City of Grapevine police policy. So while that's not determinative, it's certainly a factor for the trial court to consider in the reasonableness analysis. And the trial court didn't even mention that in the record. The trial court totally disregarded Officer Clark's failure to give a verbal warning prior to the time that he used lethal force. He had already told him 30 times, keep your hands up, stay in the car, stop. This is the guy who took him on a high-speed chase and the guy who's facing him a few feet away saying, kill me, kill me. So obviously he doesn't have a lot to lose, Mr. Villapando, if that's what he's saying to the policeman. So I wouldn't trust that he's not going to push me or try to grab my gun or push me into the traffic. This is not a normal situation. Well, I agree it's not a normal situation. There are two things, though, that I would like to address in the Court's comments. The first is the high-speed chase. We briefed that adequately for the Court, but we believe that's not relevant to the Court's consideration. The high-speed chase had totally concluded prior to the time that Mr. Villapando and Officer Clark had their encounter on the roadside. Why doesn't it matter? It's already proven to this policeman that this man is not exactly observant of the laws. It's not really someone he could trust. I think the cases in this circuit would dictate that that issue is irrelevant, the issue of the high-speed chase. And we've cited those cases for the Court in our brief that talk about, and for example, where suspects have had physical struggles with law enforcement officers, and that struggle has subsided, and then there's another incident that precipitates the use of deadly force. And the Court has written on numerous occasions that once the struggle has subsided, that the Court's only consideration is to what is occurring between the two parties at the time of the use of lethal force. You raised two points, and I'm trying to get to the second one. You weren't listening. No, I was. Well. About the kill me? Yes, yes, Your Honor. Thank you. I was listening. I believe that the video is equivocal on the exact words that Mr. Villapando was using. The words kill me are part of the record, but as to what his exact intent was in using those words, I don't think it's a Scott v. Harris where the video is conclusive. Thank you, Your Honor. Thank you, sir. You've reserved some rebuttal time. Mr. Jeffrey? Yes, sir. May it please the Court, I'm Jim Jeffrey, and I have the honor of representing Grapevine Police Officer Clark, the city, and Police Chief Salome. Chief Salome is with me here today. I'd like to start with the claim that there is no material issue of fact regarding distance, and Judge Stewart, if I may step to the side of the podium and I'll talk loudly. As long as you stay in the mic, as I said. Go ahead. We'll see where you're going. This morning I stepped off using my feet a distance of about six feet between the edge of the podium You're not on the record. and the edge of the You're not going to have a record if the microphone can't pick you up. The courtroom deputy said she can. It's not picking up. Thank you. I stepped off the distance between the podium and the edge of the bench, and using my feet, it was about six feet. And I'm about the same height as Mr. Villapando. I'm six foot two inches tall. And again, if I may step to the side and demonstrate, and then I'll speak on the record. Well, why don't you just tell us what you're planning on doing. Yes, sir. When I stand a distance of about six feet away from the edge of the bench, and I reach out, I think it's clear to see that if Officer Clark estimated a couple of different distances, we were about six feet apart. We were within as close as arm's length. I don't know how close together we were, but he was close enough that I feared he could grab me or the weapon or shove me. I think that's very relevant. And again, Judge Southwick stated he's not a great estimator of distances. I'm not either. And I don't think a police officer facing a suspect who has ignored 35 orders, including 12 orders to keep your hands visible while he's sitting in a car, and then is encountering the suspect who has relentlessly approached without obeying the officer, who has told him get back, stop, get to the back of the car, words to that effect, dozens of times, is the officer required to know the distance between them exactly before he can stop the threat? The law doesn't require that. There's not a single case that's been cited where that would be a material fact issue. And this Court's made it clear in Mentor v. Great American Insurance that a material issue of fact is only one that would change the outcome. And I would submit to you that the other flaw, fundamental flaw, in the plaintiff's argument to this Court is that they would put the burden on the officer to find a case where the same conduct was approved as lawful. I heard that when there was questioning at the deposition that was referred to here today where Officer Clark could not say that another officer, to his knowledge, had been shoved into traffic. Well, the burden is not on Officer Clark under the Qualified Immunity Defense to show that a court has approved his conduct. It's certainly useful if an officer can find a case under similar facts. But in the Supreme Court case that I cited in a letter brief I submitted yesterday, the Wesby case, once again, within the span of three years, the Supreme Court has said under the Qualified Immunity Defense the burden is on the plaintiff, in this case, to show a violation of clearly established law, which means showing the legal principle clearly prohibits the officer's conduct in the particular circumstances before him. And that's the exact opposite of what we heard here today. The burden is not on Officer Clark to find that a court said it's okay to use deadly force when somebody's within an estimated six feet or an arm's length or something like that. The burden is on the plaintiff to show that a court has said it's unlawful under all of these circumstances to use deadly force. Judge Clement, you questioned whether the high-speed chase was relevant. It certainly was relevant. You wrote in the Mendez v. Poitouvet case that the court needs to consider all of the facts known to the officer so the court can be informed as to the reasonableness of the officer's conduct. Well, those circumstances had occurred as part of this incident. The officer chased this man through 5 o'clock rush hour traffic on a Friday afternoon on State Highway 121, which is a very heavily trafficked road adjacent to or near Dallas-Fort Worth Airport. It's a major hub in the Metroplex. And the video clearly shows that as the officer is chasing this man, the fleeing suspect that he believes is a burglary suspect weaves in and out of traffic. The officer, I would submit even has some close calls at high rates of speed, drives on the shoulder of the road to get around cars that either stopped or almost stopped and then finally exits, stopping at the very edge of the exit ramp. And as the photographs that I've cut and pasted in the brief show and as the entire video show, the rest of this incident played out at the very edge of the roadway. Seventy-six cars passed. And I put in the brief at page 36 two photographs that were cut from the record. And those photographs show at the moment that shots were fired, a black pickup truck is passing. Now, it's not in the adjacent lane. It's one lane over. But what I heard here today is the plaintiff would want to put a burden on the officer to watch this threat that's coming at him. And there's a nonverbal warning of a handgun pointed continuously, it's undisputed, continuously at the suspect. There's even a photograph from bystanders at page 8 of my brief showing the officer is holding his gun up. In fact, it shows in the next picture the officer has backed up, and then he continued to back up, and that's not captured on the video or pictures. What's the speed limit on the exit ramp? I believe the speed limit in that area, unfortunately, I don't think it's actually in the record clearly, but I think it's 45 or 50. And the cars you can see going by are going by fast. Not all of them. Some of them are going by slowly or more slowly. But they're all going by fast enough to kill you. There's no doubt of that. And so the argument we hear here today is that not only must the officer who is making the warning of holding his handgun at this suspect who's facing him and ignoring his orders and disobeying his orders and saying no, not, when he's told to stop, says kill me, kill me, hits his own chest, says kill me. The officer is supposed to face that and then keep an eye on the traffic behind him. The law certainly can't require that, and there's no case that cited saying the law would require that before the officer can fire a shot to stop the threat. And that's what happened here. What else was Officer Clark supposed to do? And you have the case we actually cite in our brief about this issue of a verbal warning. In the 11th Circuit case we cite, Williams v. Deal, says that the pointing of the gun is a nonverbal warning to somebody who's approaching the officer. And in that case the suspect approached to an estimated ten feet before the officer shot to stop the threat. Officer Clark explained that he allowed this suspect to get a lot closer because he had his gun pointed already. And he also explained normal reaction time as he's been trained that if the suspect had been a distance of an estimated 28 feet away and his gun was in his holster, the suspect could close the distance and harm him before he could draw, point, and fire the gun. Now, certainly he had his gun out, but we put that into the record to explain just how fast moving things can get and very suddenly. So in the 11th Circuit case that we cited, Williams v. Deal, it was found to be lawful for the officer to shoot a suspect ten feet away. And here we're hearing argument over whether it was four feet or six feet or arm's length. All of those, I submit, are close enough that suddenly if the suspect did make a lunge, he would be on the officer, and the two of them could be in the traffic lanes where 76 cars had passed. And again, as I know in the brief at page 8, the picture shows a car, a black pickup truck passing almost at the instant shots are fired. Is the concern by officer of being pushed into the line of traffic something that was mentioned early on, or was that added to the explanation later? I believe that's both in his statement and in his deposition. Well, his declaration came next, and then the deposition was last. There's no argument that any part of this, being pushed into traffic, could have lunged and gotten the gun away from him. None of those are later arriving explanations of why he felt at risk? No. And even if they were, the intent— Are you not sure? I'm not trying to quibble with you. Are you not sure one way or the other, or are you just scaring me? No, I believe that in his statement, his statement to the initial investigators, he said he feared that he could be shoved or pushed into traffic. I believe that's stated. But I would also submit under the case law, both under the Fourth Amendment analysis and the qualified immunity analysis, that the state of mind of the suspect and the officer is not relevant. It's what the facts objectively demonstrate that's relevant. What we see in some of the cases is the obligation, maybe not legal obligation but training, to do gradual escalation of force as opposed to going from verbal word commands to shooting. He had mace, I think, or some sort of device on him. There could have been other things he did. How would that fit into this case? I would submit that at most that might be a question about policy but not a violation of law. And I'd further submit you're asking for the officer to be second-guessed. If he had used the pepper spray, which is intended to make people disabled, to incapacitate them, and the suspect fell in a traffic lane and was hit by a car, we'd be here on the case just with somewhat different facts. The purpose of pepper spray is to make it hard to breathe, to burn your eyes and potentially close them and make you lose your vision and take the fight out of you. But that often causes you to stumble and fall or wander in a place where you can't see where you're going. So I would submit, with all due respect, Monday morning quarterbacking that issue could still result in the same thing, the death of the suspect, just not from a fired gunshot. Are the policies of the Grapevine Police Department in the record? Does it say anything about gradual escalation of force before use of deadly force? I think that some of the policies, I'm not sure if they entirely are in the record, but I think that some were submitted. And generally, the policies as written do state, yes, we prefer some sort of an escalation, but the policies also allow going immediately from one level to another if the officer reasonably faces a threat. And the law allows the officer, and this is, again, looking at what the law says, particularly on probable cause. Now, the Wesby case that we cited, the Supreme Court's case last week, was nothing to do with force, but it did deal with the probable cause analysis. And dating all the way back to Tennessee v. Garner, deadly force is authorized if an officer has probable cause to believe he faces an imminent threat of serious injury. That's the standard. And probable cause is both a flexible and somewhat vague notion, and that's what the Supreme Court restates last week in the Wesby case, that probable cause deals with probabilities, not beyond reasonable doubt, not proof beyond reasonable doubt. It is a reasonable belief that a set of circumstances exists, and in the case of a search, justifying the search, and in the case of an arrest, justifying the arrest, believing that a crime has been committed. And here, when you're looking at the probable cause analysis for use of force, you have to consider the totality of the circumstances. Tennessee v. Garner states that from the beginning, and Judge Clement's opinion in the Mendes v. Poitouvet case, you have to consider all of the circumstances. So here we have the officer trying to make a traffic stop, high-speed chase, orders the suspect to keep his hands visible before the suspect gets out of the car, orders the suspect not to get out of the car. Following getting out of the car, there are 23 disobeyed orders from the suspect. And I would submit to you, I can't think of something else the officer could have done at that point. He is within a very short distance of the suspect who has disobeyed numerous orders, has shown an utter disregard for his own life and the life of the people that happen to be driving nearby, and he has now approached so close that in the judgment of the officer, if something doesn't stop the threat, I'm going to be fighting for my gun, I'm going to be physically grappling in the road, or I'm going to be shoved into the road. And so I'm not sure what de-escalation is available. He has issued so many dozens of orders. I would submit that is an attempt to de-escalate. What if they shot him in the leg? I've had that argument made, and I would submit this isn't Hollywood, Your Honor, with all due respect. That's still deadly force. And, you know, I've actually... He dies. He could die. He might not die. But it's still... Don't hit the artery. Well, but then again, shooting somebody in the leg or trying to shoot them in the arm or shoot to do something, that's not the goal of the use of deadly force. The use of deadly force is to stop the threat. The officers are trained that the most likely way to stop the threat is by hitting your target. The best way to hit your target is to aim at the center mass of the body. So that's what he did. He did as he was trained, and the law doesn't require otherwise. And I would submit that even if he had shot intentionally to hit him in the leg, I have seen, again, with that hypothetical, I've seen the training film that's used from Mr. Mossad Ayyub that is the originator of the 28-foot rule about stopping the threat when your gun is holstered. And in one of the training films created by Mr. Ayyub, as a freak accident, the suspect... I'm sorry, the person in the training film broke his leg when he twisted it as running on one of the mats and yet was still able to close the gap and with his rubber knife that had red on it to simulate a knife strike, hit the officer with a broken leg. So the best way to stop the threat is to hit the large target area of the body, center mass, and that's what the officer did. But again, the hypothetical, it would still be deadly force. And so even if he survived, we would have the same analysis. I do have, although it wasn't addressed in the reply brief and it wasn't addressed in opening argument very briefly, the city and Chief Salome have claims against them, and we submit that the claims against the city and the chief fail. They're purely conclusory. The plaintiff had an opportunity to amend the complaint and only came back with more conclusory allegations. No specific facts are alleged showing anything that would amount to deliberate indifference in city policies. No specific factual allegations are in the record within the standards of the Iqbal Supreme Court case in Iqbal that would show a customer policy that the policymakers actually or constructively knew about, that a constitutional violation occurred, and the policy is a moving force behind the violation. And those have been the standards in this circuit since the Meadowbriar and the Spiller cases. And I would submit that both the Rios v. City of Del Rio case and the City of Los Angeles v. Heller case, the Del Rio case, is from this circuit, and the Los Angeles v. Heller case is from the Supreme Court. If there's not a constitutional violation, then of necessity, the claims against the chief and the city would also fail. And here we would submit there's not only not a constitutional violation, that Officer Clark has qualified immunity to it, but looking just at the claims against the chief and the city, those claims fail under the Monal analysis. It's interesting that in the opening brief, the plaintiffs didn't even cite Monal when they were trying to address those cases. I see I have several seconds left. I'll be happy to give them back unless there's another question to answer. I think we have your argument. Thank you, Mr. Jeffrey. You've been pretty comprehensive in your response. Thank you. Thank you, Your Honor. All right. Mr. Hummel, Roberto. Mr. Hummel. Thank you, Your Honor. I would like to address the pleading issue briefly. The Second Amendment complaint does raise factual issues regarding the hiring of Officer Clark. He had prior discipline with the DFW Police Department. He resigned under questionable circumstances. He was discharged from the Navy under questionable circumstances, and he had been rejected for hiring by a couple of different law enforcement agencies prior to his hiring. Interestingly, in his job application with Tarrant County Community College, he stated, this job is like my time spent in the military, which raises an interesting issue about military training versus law enforcement training, which are two diametrically opposed concepts. Military training is, of course, you train to kill people. In law enforcement, you are trained to preserve life, if at all possible. I would submit to the court that that does create some issue with regard to the hiring and the need for additional training of Officer Clark on the issue of the use of deadly force. Let me ask you a question. More and more of these cases, of course, we have the dash cams and so forth,  so unlike just having to take cold record, more and more, we're looking at the video of actually what transpired, et cetera. My question is, one could argue the video cuts both ways. Is your argument the video best helps your case from the standpoint of your arguments about where Mr. Filippondo's hands were, and so on and so forth, or what? Of course, they can argue. It shows the attendant circumstances, the high traffic volume, the danger to the officer, et cetera. We get the videos more and more as opposed to just he said, she said, so we're looking at it. What's your best argument of how this video helps you? Is it what you've already said in terms of the placement or not of Mr. Filippondo's hands, et cetera? Then what do you do with the counter arguments about danger, et cetera, et cetera? Well, I do think that the video does support our argument with regard to the hands and the lack of a manus act of lunging, reaching, and coupled with Officer Clark's deposition testimony. But the proximity of the two of them there, and then all the recitation of stop, et cetera, et cetera, I mean, how do you neutralize all that? Because we don't always, and every case is different, but I mean, plenty of cases we don't have all that prolonged. I mean, to me they're all bad, but if we get some where there might have been a few words that changed, the next thing we know we've got a shot. Here, the time period is pretty extensive. I'm not saying it changed the end, but this one is pretty long going on, this long, long period between the two, stop 30 times, whatever the numbers are, boom-de-boom-de-boom and all that. Does that not negate maybe what otherwise might be a strong point for you about his hands given this lengthy period of time between them in close proximity? You understand what I'm asking? I do. I think the benefit of the video for our side of the case is the lack of any threatening gestures on the part of Mr. Villapando towards the officer. He never verbally threatened him. He never said, I'm going to kill you, I'm going to cause any harm to you at all, which our president in a lot of the other cases granted a qualified immunity. So I do think it's beneficial there. I do think it's beneficial on the issue of the traffic, even though there is traffic. Nobody's disputing there was traffic. The issue is whether there was traffic at the time of the shooting. And I would submit to the court that the photo submitted by the Appleese is not necessarily at the time of the shooting, and there's no way to know in the record whether that was at the time of the shooting.  And the lack of any verbal threats on the part of Mr. Villapando, I think the trial court unfairly characterized his demeanor as being agitated, which is another weighing of the evidence in favor of the non-movement. So I do feel like that in those ways that the video does benefit our side of the case. All right. Well, you've otherwise got a red light. I ask you that simply because the video is such a prominent part of the case, both in terms of your briefing and photos. I mean, it's there for us to see. So that's the benefit of oral argument, asking you what it is you want us to hone in on. Otherwise, I think we've briefed this one pretty extensively. So if you've got a burning last sentence you want to make, I'll let you make it. Otherwise. Well, I will let our record lay where it is, Your Honor. Okay. All right. Thank you. Thank you, counsel, both sides. Difficult case to state the obvious. But we appreciate your briefing and argument and supplying us with a whole lot of photos. We'll look at it. Thank you. This concludes the oral argument cases. We'll be in recess until 9 a.m. in the morning.